```
                                                              FILED
                                                        U.S. DISTRICT COURT
                                                           AUGUSTA DIV.
         IN THE UNITED STATES DISTRICT COURT
                                                        2005 DEC 13 AM 8:18
         FOR THE SOUTHERN DISTRICT OF GEORGIA
                                                        CLERK L. Ilander
                    AUGUSTA DIVISION                      SO. DIST. OF GA.
```

UNITED STATES OF AMERICA   )
                           )
v.                         )   CR 105-104
                           )
JAMES KUUIPO WOLFE         )

---

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has accused Defendant James Kuuipo Wolfe ("Wolfe") of possession of a firearm by a convicted felon. The matter is now before the Court because Wolfe moved to suppress "any and all evidence or derivative evidence arising from the arrest, search and seizure of [his person] on August 2, 2004 at 1211 Greene Street" in Augusta, Georgia. (Doc. no. 25). The Court held an evidentiary hearing on the matter, at which time the Court heard testimony from Investigator Ty Hester ("Inv. Hester") with the Narcotics Division of the Richmond County Sheriff's Office ("RCSO"), Special Agent Pat Clayton with the United States Drug Enforcement Agency, Marla Taylor, Wolfe's girlfriend and mother of his child, and Wolfe.[1] Now, for the reasons developed more fully herein, the Court **REPORTS** and **RECOMMENDS** that the motion to suppress be **DENIED**.[2]

---

[1] Wolfe invoked the Rule of Sequestration at the hearing.

[2] Wolfe originally filed a preliminary motion to suppress which did not comply with the specificity requirements of Loc. Crim. R. 12.1. (Doc. no. 11). Because Wolfe subsequently filed the particularized motion discussed herein, the Court **REPORTS** and **RECOMMENDS** that the preliminary motion be deemed **MOOT**.

## I. FACTS

The events forming the basis for the motion to suppress occurred on August 2, 2004, at a boarding house located at 1211 Greene Street in Augusta, Georgia. In a nutshell, Inv. Hester searched a black Chevrolet Corsica that Wolfe had claimed as his own. During that search Inv. Hester discovered $4,000 in cash in a cooler in the trunk and two firearms under the lining of the trunk. A background check on Wolfe revealed that he had previously been convicted of a felony drug offense in Richmond County on January 14, 2000. Thus, as a result of the search, Wolfe now faces charges under 18 U.S.C. § 922(g) for possession of a firearm by a convicted felon.

Despite this seemingly uncomplicated overview of the facts, the Court heard sharply divergent accounts of the details of the manner in which Inv. Hester came to search the Corsica. Thus, the Court will review the testimony of each witness appearing at the evidentiary hearing.

### A.   Marla Taylor

Ms. Taylor is the girlfriend of Wolfe and the mother of his child. She is also the registered owner of the Corsica in which the guns were discovered. According to her testimony, she purchased the two handguns for $75 from a man whom she did not know that approached her outside of a pawn shop. Ms. Taylor reported going to the pawn shop in search of a gun for protection for herself and for her son when they went to see Wolfe at the boarding house on Greene Street. Prior to entering the pawn shop, she was approached by the man who told her that he could provide her a "deal" on two guns. According to Ms. Taylor, this unidentified seller placed the guns in her trunk because, although she was buying

the guns for protection, she was afraid to handle them. Ms. Taylor also could not recall any details about whether or what kind of ammunition she had received when she purchased the guns.

Having purchased the guns and having had them concealed under the lining in the trunk of her car, she switched cars with Wolfe either later on the night of the purchase or the next night. Ms. Taylor and Wolfe often swapped vehicles because Wolfe's car operated more smoothly than her Corsica. Although she knew that Wolfe was a convicted felon, she testified that she did not tell him that the guns were in the trunk. Ms. Taylor put no restrictions on Wolfe's use of the car.

Ms. Taylor was not present at the boarding house on August 2, 2004 when Inv. Hester came in contact with Wolfe, and she had no information about the manner in which Inv. Hester obtained the keys to the Corsica and/or conducted the search of the Corsica.

**B.    Inv. Hester**

Inv. Hester testified that on August 2, 2004, a confidential source told him that crack cocaine was being sold from a black Chevrolet Corsica, tag number 8499 ATT, that was parked behind a boarding house located at 1211 Greene Street. The source also told Inv. Hester that the person selling the drugs was a black male with "lots of hair." Inv. Hester proceeded to the boarding house - an address with which he was familiar from previous investigations - and as he approached the address, he saw three black males - one of whom had lots of hair - sitting on the front porch. Having noticed that Inv. Hester was approaching in an unmarked police vehicle, the three men stood up and walked inside the boarding house.

3

Inv. Hester pulled around the back of the building and located the black Corsica that had been identified by the source; he confirmed that the tag numbers matched.

Inv. Hester asked a man cleaning the yard if he knew to whom the Corsica belonged; the man could not provide a name but said that the individual was in Room 2. Inv. Hester then called for assistance to do a "knock and talk," and three other law enforcement officers came to the scene, one of whom was Sergeant Mathue Phares of the RCSO. The officers proceeded to Room 2, where they found Wolfe, along with two other black males.[3] Inv. Hester asked to whom the Corsica belonged, and Wolfe said that the car was his. Inv. Hester explained that he was there because he had gotten information that crack cocaine was being sold from the vehicle. Wolfe denied that he was selling drugs and was cooperative in answering Inv. Hester's questions. Inv. Hester testified that he asked if he could look in the car, and Wolfe handed over the keys from his pants pocket. Inv. Hester stated that he did not have Wolfe sign a consent to search form because he did not routinely use the forms when searching a car, particularly when, as Wolfe had been, the individual was cooperative. Inv. Hester also testified that at no time during his encounter with Wolfe did he withdraw his permission to search.

Upon looking in the trunk of the Corsica, Inv. Hester found a cooler containing $4,000 cash divided into thousand dollar stacks. Inv. Hester kept searching and found the two guns beneath the trunk lining. Wolfe claimed ownership of the weapons and said that he needed them for protection. Inv. Hester testified that at this point, based on the presence

---

[3] As Wolfe's booking picture confirms, he had "lots of hair" on August 2, 2004. Gov't Ex. 1.

of the cash and weapons, he expected to find drugs. Thus, Inv. Hester closed the trunk, and called for a K-9 unit to come to the scene.

The K-9 unit arrived. The dog alerted on the trunk. Inv. Hester testified that it was not unusual for the K-9 to alert even though, as here, drugs may not actually be recovered from a visual search because the trained dogs can detect drugs that may have been present several days to a week prior to the alert. Once the trunk was opened, the K-9 alerted to the cooler. Inv. Hester then ran a records check on Wolfe and discovered that he had a prior felony record for possession of cocaine and marijuana with intent to distribute. Wolfe was informed of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), waived his right to counsel on a waiver form, and then provided a written confession:

> My name is James K Wolfe[.] I had two guns for protection found in my Chevy. Also I had my life saving[s] in my car which was $4,000 dollars. I did no[t] mean any harm I was just try[ing] to make a living and it's hard when thing[s] around you cause you to be a bad guy - I will remain doing my best always.

Gov't Exs. 2, 3.

Inv. Hester prepared a written report, dated "081104," of the events of August 2, 2004. Def.'s Ex. 2. This report, dated over a week after the events in question, made no mention of the confidential source alerting Inv. Hester to the presence of a black man with lots of hair at the Greene Street boarding house where the Corsica had been located. Inv. Hester acknowledged at the hearing that he missed including that detail in his report. Inv. Hester also confirmed at the hearing that his report did not contain any mention of the K-9

unit coming to the scene. He testified that because Wolfe had not been charged with anything as a result of the K-9 alert, he did not feel it was necessary to list the K-9 handler as a witness or to include the details of the K-9 activities in his report.

Inv. Hester further acknowledged that there were discrepancies between the DEA 6 report prepared by Special Agent Clayton and his RCSO report.[4] For example, the sequence of events of Inv. Hester's contact with Wolfe was out of order, and some of the details of the information provided by the confidential source were incorrect. Notably, however, as discussed in more detail immediately below, Inv. Hester did not provide Special Agent Clayton with the information for the DEA 6 report.

C.  **Special Agent Clayton**

Special Agent Clayton's report was prepared on August 5, 2004. Def.'s Ex. 2. Thus, it was written nearly one week prior to the point at which Inv. Hester completed his RCSO report. Special Agent Clayton's testimony was in agreement with that of Inv. Hester that the information for the DEA 6 report did not come from Inv. Hester. The testimony from Special Agent Clayton was that he got his information from Sgt. Phares of the RCSO. As noted above, Sgt. Phares was one of the officers who responded to Inv. Hester's request for assistance prior to proceeding with the "knock and talk" at the Greene Street boarding house. Sgt. Phares was neither the officer who received the tip from the confidential source, nor the first officer on the scene. As Special Agent Clayton was not at the scene on August 2, 2004, and received his information based on the second-hand descriptions of an officer that served

---

[4] A DEA 6 report was prepared because the $4,000 found in the trunk of the car was subject to forfeiture.

6

as back up at the scene, his testimony and written report is of little value to deciding the issues now before the Court.

**D.     Wolfe**

Wolfe testified that on August 2, 2004, he had worked about four hours in the morning at Powell Logging before returning to his upstairs room at the Greene Street the boarding house. His water was not working that day, so he went downstairs to another apartment to take a shower. Wolfe got ready to take a shower and heard a knock at the door. Wolfe testified that the resident in whose room he was preparing to take a shower answered the door; this resident was named Joseph. Wolfe could not provide a last name or current location for Joseph. According to Wolfe's testimony, approximately three officers came in, accompanied by a K-9 unit, and immediately searched Joseph's room. However, the officers did not tell the men what they were looking for. Then, the occupants of Joseph's residence, including Wolfe, were lined up against a wall and searched. Wolfe testified that it was at that point that Inv. Hester removed the keys to the Corsica from Wolfe's pants.

When Inv. Hester asked whose car was parked out back, Wolfe claimed ownership of the car. However, Wolfe adamantly testified that when Inv. Hester asked if he could search the car, Wolfe did not give consent; he simply repeated that the car out back was his and then looked at Inv. Hester. Wolfe further testified that Inv. Hester, the K-9 unit, and the other officers then proceeded to take Wolfe around the house to where the Corsica was located. Inv. Hester began searching the car, and throughout the walk to the car and subsequent search, an officer was holding the back of Wolfe's pants.

Wolfe stated that during the search, he asked Inv. Hester what he was doing and told him that there was nothing in the car. When Inv. Hester found the $4,000 in the trunk, Wolfe told him that was his life's savings from selling compact discs of his rap shows and working for his father at Powell Logging. Wolfe was saving to buy a new car and find a better place to live. According to Wolfe, the money had been in the trunk for about a week.

Wolfe testified that he did not tell Inv. Hester to stop searching the car because there really was not time. He was trying to figure out what was going on while one officer was holding his pants and another was simultaneously searching the Corsica and asking questions. In addition, Wolfe testified that he has obtained his General Educational Development (GED) diploma and earned a Business Administration trade degree at Augusta Technical College and is able to read and write. Yet, he was never presented with, or asked to sign, a consent to search form. However, Wolfe did acknowledge at the hearing that he initialed and signed the Waiver of Counsel form and provided a written confession after the guns were discovered in the Corsica. He further testified that he lied in his written confession because he did not want Ms. Taylor to get in trouble.

## II. DISCUSSION

Wolfe bases his motion to suppress on the Fourth Amendment's prohibition against unreasonable searches and seizures. According to Wolfe, Inv. Hester needed - but did not have - one of the following to search the Corsica on August 2, 2004: a warrant, voluntary consent, or sufficient probable in exigent circumstances. Thus goes the argument, the fruits of the search and subsequent arrest must be suppressed. The government counters that Wolfe voluntarily consented to Inv. Hester searching the Corsica, and even if Wolfe did not

voluntarily consent, Inv. Hester had probable cause to search the car without a warrant based on the corroboration of several aspects of a tip that a black male with lots of hair was selling crack cocaine out of a specific car located at a specific location. This probable cause, according to the government, brings the search within the automobile exception to the warrant requirement.

**A.    Consent**

Somewhat confusingly, Wolfe argues that he did not give consent to search the Corsica (hearing testimony), but alternatively, any consent that he may have given was not voluntary.[5] (Doc. no. 31, p. 3). The government notes the inconsistency of arguing that Wolfe did not give consent, but also that this possibly non-existent consent was not voluntarily given. (Doc. no. 32, pp. 3-4). The Court first turns its attention to whether Wolfe told Inv. Hester that he could search the Corsica.

**1.    Consent To Search?**

Of course, the Court's finding on this issue is shaped by its credibility choices that must be made between conflicting testimony. "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations

---

[5]The Court also notes that Wolfe's affidavit in support of his motion is carefully drawn to say that Wolfe "did not give a verbal or written consent to search as required by law." (Doc. no. 25, Wolfe Aff. ¶ 4 (emphasis added)). This ambiguous statement is open to various interpretations, one of which is that some kind of consent was given but was somehow not legally valid consent.

9

are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

When weighing the credibility of the differing versions of whether Wolfe consented to a search and handed over his keys or whether Inv. Hester took the keys without permission and searched the car, the evidence concerning the subsequent unfolding of events weighs in favor of Inv. Hester's testimony. Inv. Hester testified that the keys were handed over and consent was given in response to his announcement that he was investigating the possible sale of drugs and to confirm Wolfe's denial of such activity. Wolfe testified that he knew there were no drugs in the car, suggesting that one of the most convenient ways to rid himself of the police would have been to allow access to the car to confirm that no drugs were present. Moreover, Wolfe testified that in response to Inv. Hester's request to search, he simply repeated that the car was his and then looked at the officer. There was no explanation for the "non-answer" to Inv. Hester's direct question. An affirmative or negative response would be the most logical response, and all of the credible evidence points to Wolfe responding with an affirmative response to the request to search.

Moreover, Wolfe conceded at the hearing that once the search of the car started, he never said anything along the lines, "Stop searching." Wolfe's testimony that he did not have time to say anything makes little sense in light of the fact that the group had to walk from Room 2 to the back of the boarding house to reach the Corsica and that Inv. Hester had time to find and inspect a cooler in the locked trunk before continuing his search under the trunk

lining. Additionally, there was no evidence of coercion at the time Inv. Hester asked for permission to search, a point at which Wolfe was in the presence not only of the law enforcement officers but also other boarding house residents. Although Wolfe testified that he was being held by the back of his pants during the walk from Room 2 to the Corsica and while Inv. Hester went through the car, that fact does not account for why he would have refused consent at Inv. Hester's first request, when other boarding house residents were present and his pants were not in the hands of law enforcement. Notably, none of these other residents were available to support Wolfe's implausible version of events. In addition, if Wolfe had not been cooperating with Inv. Hester and had not consented to the search, it would make no sense for him to sign the Waiver of Rights form and write a confession after the guns were found.[6] That a consent form was not signed prior to the search is consistent

---

[6] Wolfe's claim at the hearing that he lied in his written statement to protect his girlfriend, Ms. Taylor, further undermines his credibility. First, as was revealed at the hearing, Ms. Taylor is not a convicted felon, and at the time the guns were discovered, there would be nothing to obviously suggest that possession alone of two weapons by Ms. Taylor was inherently illegal. Next, if Wolfe was primarily concerned with protecting Ms. Taylor, why have her appear in federal court and testify to purchasing a stolen gun (one of the recovered guns was later determined to have been stolen three days prior to August 2, 2004 (doc. no. 32, p. 3 n.1)) from an unidentified man that she had first met on the street outside a pawn shop approximately fifteen to twenty minutes prior to the purchase?

Indeed, Ms. Taylor's testimony is suspect in that she claims to have bought the guns for protection, at a bargain price of $75, yet she testified that she did not want even to handle the guns to put them in the trunk. She also could not say with any certainty what kind of ammunition she may or may not have received with the weapons. If the guns were for her protection, surely she would have wanted to know that there was appropriate ammunition to sufficiently operate the weapons. The placement of the guns in the trunk by the unknown seller on the street is even more curious in light of the fact that Wolfe testified that the $4,000 had been in the trunk of the Corsica for approximately one week. As the purchase of the guns was estimated to be one to two days before the August 2nd search, that means that Ms. Taylor would have had to give the man selling the guns on the street, whom she just met, access to her trunk - and the $4,000 - when she was alone and afraid to handle a weapon. Finally, as Ms. Taylor was aware that Wolfe is a convicted felon, it makes little

with Inv. Hester's testimony that the consent to search forms are not generally used for cars, particularly when, as here, the individual is cooperative.

Additionally, defense counsel's attempt to cast doubt on Inv. Hester's testimony that consent was given by Wolfe by pointing out discrepancies between the RCSO report and the DEA 6 report is but a red herring. Special Agent Clayton testified that his report had been prepared well in advance of the preparation of the RCSO report and was based on his conversations with Sgt. Phares, an officer who arrived at the Greene Street boarding house after Inv. Hester had first received the tip and then had called for assistance. Inv. Hester and Special Agent Clayton did not prepare their reports at the same time or base them on the same information, and Inv. Hester confidently testified at the hearing that some of the details in the DEA 6 report were simply wrong. Special Agent Clayton did not attempt to deny or gloss over any discrepancies, but rather simply explained that his report was based on the second-hand account he received from a back-up responder to the Greene Street scene. The Court finds nothing inherently suspicious about the discrepancies between the reports such that it would be appropriate the disregard Inv. Hester's reasonable, logical testimony - supported in particular by Wolfe's cooperativeness in signing a Waiver of Rights form and providing a written confession - that Wolfe consented to the search.

Having reviewed the testimony at the hearing, having observed the demeanor of the witnesses, and having considered the interests of the witnesses, the Court concludes that Wolfe has crafted an after-the-fact exculpatory explanation for the sequence of events

---

sense that she would surreptitiously purchase two weapons from a dubious source, hide them under the lining in her car trunk, and then give the vehicle to Wolfe to use without ever mentioning the guns.

leading up to the discovery of the weapons hidden in the trunk of the Corsica that is simply not credible. In sum, the Court credits the testimony of Inv. Hester over that of Wolfe and concludes that Wolfe consented to the search on August 2, 2004. Next, the Court turns its attention to whether than consent was voluntarily given.

### 2. Voluntary Consent?

When the government relies on consent to validate a search, it has the burden of proving that the consent was voluntary. Schneckloth v. Bustamonte, 412 U.S. 218, 222-23 (1973). Specifically, the government must show that, under the totality of the circumstances, the consent was basically a free and unconstrained choice; that is, the person's will was not overborne and his capacity for self determination was not critically hampered. United States v. Watson, 423 U.S. 411, 424 (1976). Whether the subject of the search knew he had a right to refuse consent, though a factor to consider, is not controlling. Schneckloth, 412 U.S. at 234. In the Eleventh Circuit, a court examining whether a suspect voluntarily consented to a search should consider the following non-exhaustive list of factors, none of which is dispositive:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse consent to the search, the defendant's education and intelligence, and significantly, the defendant's belief that no incriminating evidence will be found.

Tukes v. Dugger, 911 F.2d 508, 517 (11th Cir. 1990) (citing United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984) (quoting United States v. Phillips, 664 F.2d 971, 1023-24 (5th Cir. Unit B 1981)).

Here, Wolfe testified at the hearing that he knew the object of Inv. Hester's search - drugs- were not in the car, a factor which goes to Wolfe's state of mind when granting permission and heavily weighs in favor of a finding of voluntariness of the consent to search. Moreover, as Wolfe's demeanor at the hearing and his educational background of obtaining a GED and a degree from a technical college reveal, he is an educated individual who had the capacity to understand what was going on when Inv. Hester said that he wanted to search the car. There is nothing to support the conclusion that Wolfe was confused or misunderstood that Inv. Hester was going to search the car upon receiving Wolfe's permission to do so. In fact, once the weapons were discovered, Wolfe further cooperated with officers by initialing and signing a Waiver of Rights form and providing a written confession claiming ownership of the guns. Gov't Exs. 2 & 3. If Wolfe had somehow had his will overborne or been coerced into giving his consent, there would have been no logical reason for him to display such cooperativeness after the discovery of the weapons.[7]

Nor does Wolfe's assertion that he was held by the back of his pants while his car was searched convince the Court that the consent given was anything other than voluntary. Wolfe did not testify that he was held by his pants when Inv. Hester first asked for permission to search. While there were one to two officers other than Inv. Hester present when the investigator asked for permission to search, there were also other boarding house residents present in the room with Wolfe. Wolfe testified that the K-9 unit had searched Joseph's room, but he did not testify that the dog, or the officers for that matter, were

---

[7]The explanation concerning a desire to protect Ms. Taylor has already been discussed and discredited in note 6, *supra*.

menacing or threatening him while Inv. Hester waited for a response to his question about obtaining permission to search the car. The circumstances do not call for a finding that there were any custodial or coercion issues that would have overcome Wolfe's ability to give voluntary consent to search the Corsica.

In sum, under the totality of the circumstances as set forth by the documentary evidence and credible testimony at the hearing, the Court concludes that on August 2, 2004, Wolfe voluntarily consented to letting Inv. Hester search the car.

**B.     Probable Cause to Search the Vehicle**

The government also contends that even if the Court were to conclude that Wolfe did not voluntarily give consent to search the car, Inv. Hester had probable cause to search the car based on his corroboration of the tip he received about a black male with "lots of hair" selling crack cocaine out of a specific car, with a specific tag number, that was parked at a specific location on Greene Street. Wolfe arguably concedes the probable cause determination but contends:

> Although probable cause might exist, exigent circumstances are not present. The car was parked in a yard and there was no evidence, even through surveillance, that the car was moving. In addition, the officers responded to the house on a Tuesday afternoon, at a time that they could have procured a warrant. The usual fears of flight were not present.

(Doc. no. 32, p. 3).

"In most circumstances, for a search that is not based on consent to comply with the Fourth Amendment, law enforcement must obtain a warrant supported by probable cause. There are, however, exceptions." United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). Relevant to this case, there is an automobile exception to the warrant requirement.

This exception was first set forth in Carroll v. United States, 267 U.S. 132 (1925), wherein "the Court recognized that the privacy interests in an automobile are constitutionally protected; however, it held that the ready mobility of the automobile justifies a lesser degree of protection of those interests." California v. Carney, 471 U.S. 386, 390 (1985). Subsequently, the Supreme Court has explained the rationale for this exception as follows:

> Our first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's "ready mobility," an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear. California v. Carney, 471 U.S. 386, 390-391, 105 S. Ct. 2066, 2068-2069, 85 L. Ed.2d 406 (1985) (tracing the history of the exception); Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925). More recent cases provide a further justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation. Carney, supra, at 391-392, 105 S. Ct., at 2069-2070. If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more. Carney, supra, at 393, 105 S. Ct., at 2070.

Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)(*per curiam*). Specific to the probable cause determination, the Eleventh Circuit has ruled, "Probable cause for a search exists when under the totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). An anonymous tip may be considered in the probable cause determination, and corroboration of the details of a tip prior to a search are relevant to the totality-of-the-circumstances analysis. Gates, 462 U.S. at 237-39, 241.

Here, the Court comfortably concludes that there was probable cause to search the car based on Inv. Hester's corroboration of the information from the confidential source that

there was a black Chevrolet Corsica, tag number 8499 ATT, parked behind a boarding house at 1211 Greene Street and that a black male with "lots of hair" was associated with the Corsica.[8] Upon his arrival at the boarding house, Inv. Hester found the black Corsica, with a tag number matching that given by the source, parked out back. Wolfe, a black male with "lots of hair," was in Room 2 of the boarding house and claimed ownership of the vehicle from which the source had reported drugs being sold.

Moreover, Wolfe provides nothing in support of his apparent contention that because the Corsica had not been observed in motion, it was not "readily mobile." To the contrary, the Supreme Court has described ready mobility as the capacity to be quickly moved and has noted that even when a vehicle is found stationary, it is "obviously readily mobile by the turn of an ignition key, if not actually moving." Carney, 471 U.S. at 391, 393. Based on the hearing testimony that Ms. Taylor had exchanged vehicles with Wolfe the night before the contested searched, it is clear that the Corsica was capable of moving at the turn of an ignition key, and was, therefore, "readily mobile."

In sum, the Court finds that even if Wolfe had not voluntarily consented to the search of the Corsica - a position discounted, *supra* - there was probable cause sufficient to justify

---

[8] The fact that the RCSO report did not contain the detail about a black male with "lots of hair" being identified by the confidential source as associated with the Corsica does nothing to undermine the import of the other corroborating factors that a specific type of car with a specific tag number would be at a specific address. Thus, even if the Court were to accept defense counsel's suggestion that the detail of a black male with "lots of hair" should be disregarded from the probable cause analysis, given the corroboration of the other aspects of the tip, there was still a "fair probability" that contraband would be found in the black Corsica, tag number 8499 ATT, parked at 1211 Greene Street - an address that was familiar to Inv. Hester, a narcotics officer, through his previous investigations.

the search under the automobile exception to the warrant requirement of the Fourth Amendment.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that Wolfe's preliminary motion to suppress be deemed **MOOT** (doc. no. 11) and that his particularized motion to suppress be **DENIED**. (Doc. no. 25).

SO REPORTED and RECOMMENDED this 13th day of December, 2005, at Augusta, Georgia.

_____
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

# United States District Court
## Southern District of Georgia

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| vs. | * | CASE NO. CR105-104 |
| JAMES KUUIPO WOLFE | * | |
| | * | |
| | * | |

The undersigned, a regularly appointed and qualified deputy in the office of this Clerk of this District, while conducting the business of the Court for said Division does hereby certify the following:

1. Pursuant to instructions from the court, and in the performance of my official duties, I personally placed in the U.S. Mail a sealed envelope bearing the lawful frank of the Court, and properly addressed to each of the persons, parties or attorneys listed below; and

2. That the aforementioned envelope(s) contain a copy of the documents known as Rpt & Recomm dated 12/13/05, which is part of the official records of this case.

Date of Mailing: 12/13/05
Date of Certificate: 12/13/05

SCOTT L. POFF, CLERK

By _[signature]_

NAME:
1. James Wolfe
2. Victor Hawk
3.
4.
5.
6.
7.

Cert/Copy
- ☐ ☐ District Judge
- ☐ ☒ Magistrate Judge
- ☐ ☐ Minutes
- ☐ ☐ U.S. Probation
- ☐ ☐ U.S. Marshal
- ☐ ☒ U.S. Attorney
- ☐ ☐ JAG Office

Cert/Copy
- ☐ ☐ Dept. of Justice
- ☐ ☐ Dept. of Public Safety
- ☐ ☐ Voter Registrar
- ☐ ☐ U.S. Court of Appeals
- ☐ ☐ Nicole/Debbie
- ☐ ☐ Ray Stalvey
- ☐ ☐ Cindy Reynolds